**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

United States of America,

Plaintiff,

v.

Nicholas Roosevelt Ward,

Defendant.

No. CR-25-01229-001-TUC-JGZ (BGM)

**ORDER**

On March 4, 2026, Magistrate Judge Bruce G. Macdonald issued a Report and Recommendation ("R&R") (Doc. 70), recommending that the Court deny Defendant Nicholas Ward's Motion to Suppress Evidence (Doc. 54). Defendant timely filed an Objection to the R&R, (Doc. 71), and the Government filed a Response to the Objection, (Doc. 73). For the following reasons, the Court will sustain the Objection and grant Defendant's Motion to Suppress.

**I. Report & Recommendation**

After an evidentiary hearing, the Magistrate Judge found that United States Border Patrol Agent Gamblin had a particularized and objective basis to suspect that Defendant was engaged in alien smuggling and to stop his vehicle. (Doc. 70 at 5–6.) In support, the Magistrate Judge credited Agent Gamblin's nearly eight years of Border Patrol experience in the Coronado National Memorial and the surrounding border region; information relayed by agents at the Sonoita Border Patrol Station that Defendant's rental vehicle had traveled quickly through several canyon areas known to be used by alien smugglers, in what was

described as an "uncommon and evasive traffic pattern"; the timing of the vehicle's movements near a Border Patrol shift change; and the vehicle's out-of-state plates and rental status. (*Id.* at 2–3, 6.) The Magistrate Judge analogized these circumstances to *United States v. Valdes-Vega*, 738 F.3d 1074 (9th Cir. 2013) (en banc). (*Id.* at 6–7.)

## II. Review Standard

A district judge must make a de novo determination of any portion of a magistrate judge's report to which objection is made, and may accept, reject, or modify the recommendation in whole or in part. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3). Because Defendant objects to the Magistrate Judge's finding of reasonable suspicion to stop his vehicle, the Court reviews de novo the evidence presented by the Government to establish reasonable suspicion.

## III. Evidence Supporting the Vehicle Stop

On the afternoon of February 1, 2025, United States Border Patrol Agent Jack Gamblin stopped Defendant's vehicle, a 2024 Nissan Rogue[1] bearing a California license plate, as it left the Coronado National Memorial heading east on Montezuma Canyon Road. The stop was based primarily on information relayed from the Sonoita Border Patrol Station that the vehicle had entered and exited several canyons west of Montezuma Pass, in an area the Sonoita Station patrols, "in a pretty quick manner that wasn't consistent with normal day-to-day visitor traffic." (Doc. 64 at 23:9–12.)

Agent Gamblin, the Government's only witness,[2] has served as a United States

[1] The record contains inconsistent references to the model of Defendant's vehicle. Agent Gamblin testified on direct examination that the vehicle reported by the Sonoita Station was a 2024 Nissan Rogue, but defense counsel referred to the vehicle as a Nissan Pathfinder during cross-examination. (*See* Doc. 64 at 22:3–9, 32:11–25.) The parties' briefing and the R&R likewise use both descriptions, although the same California license plate, 9MBE647, is associated with the vehicle under each description. (*See* Docs. 54 at 2; 70 at 1–2.) Because the distinction between the two models does not affect the reasonable suspicion analysis, the Court refers to the vehicle as a Nissan Rogue, consistent with Agent Gamblin's direct testimony.

[2] The defense called Raymond Duron, a private investigator with substantial experience in border-related cases, who canvassed the area on December 22, 2025, driving Montezuma Canyon Road east over Montezuma Pass—the road on which Defendant's vehicle was stopped—and photographing what he observed. (Doc. 64 at 45:25–46:17, 48:22–49:1.) Mr. Duron testified that National Park Service figures show an average of 135,565 visitors to the Memorial each year between 2015 and 2024, and that the visitor log at Montezuma Pass recorded visitors from many states and from Taiwan, Germany, the United Kingdom,

Border Patrol agent for nearly eight years, all of them at the Brian A. Terry Station near Naco, Arizona. (Doc. 64 at 12:14–21.) The Brian A. Terry Station's area of responsibility extends from Douglas west to Sonoita and includes part of the Coronado National Memorial; the Sonoita Border Patrol Station patrols the area west of the Brian A. Terry Station's boundary. (*Id*. at 13:11–18, 14:3-7.) The Huachuca Mountains form the boundary between them. (*Id*. at 14:3–10, 28:24–29:6.) The area west of the pass, which the Sonoita Station patrols, lies at the far eastern edge of that station's territory and is "a little remote for them." (*Id*. at 14:6–13.) Because the Sonoita Station does not always have agents assigned that far east, it frequently contacts the Brian A. Terry Station for assistance, and the two stations routinely share information. (*Id*. at 13:22–25, 14:13–16.) Agent Gamblin described the west side of the mountain pass as "all open national park"; east of the pass are "rural and neighborhood-style environments," with Sierra Vista to the north. (*Id*. at 15:17–22.) The nearest main road runs approximately one mile north of the international boundary. (*Id*. at 15:25–16:1.)

Agent Gamblin estimated that he has spent roughly ninety percent of his career working on the far western side of his station's area, including the mountains and the Memorial. (*Id.* at 20:6–8.) His patrol experience, however, does not extend west of Montezuma Pass; when asked how far west he typically travels on roving patrol, he answered, "The mountain pass itself." (*Id.* at 29:24–30:11.) His patrols thus do not ordinarily take him into the area patrolled by the Sonoita Station, and his station lacks access to the assets Sonoita Station uses to monitor its side. (*Id.* at 14:10–12.) Agent Gamblin did not know how many alien smuggling arrests are made each year in the Memorial or in his station's area of responsibility. (*Id*. at 30:12–17.) He explained that he learns of traffic activity in Sonoita's area mainly when the two stations work jointly;

---

Australia, Japan, and Canada, with California appearing most often. (*Id*. at 48:11–21, 61:9–62:15.) He described recreational uses of the area including hiking, fishing, boating, and bird watching; testified that every vehicle he observed between Parker Canyon Lake and the visitor center was a sport utility vehicle or pickup truck; and testified that cellular and GPS service along the route was intermittent, requiring him to navigate by paper atlas. (*Id*. at 47:25–48:7, 53:11–14, 63:8–17.) His photographs were admitted as Exhibits 10-A through 10-ZZ. (*Id*. at 68:1–5.)

otherwise, he is "generally not privy" to it. (*Id*. at 31:9–15.)

Although Agent Gamblin's patrols did not ordinarily extend into the Sonoita Station's area of responsibility, he testified about smuggling practices in that area and his own. When asked what human smuggling organizations do in his area of responsibility, Agent Gamblin explained that "Sonoita shares the similar characteristics just because of our close proximity" and testified that the current trend is for persons who cross the border unlawfully in this remote area to be picked up by vehicle because it is not feasible for them to continue north on foot; transnational criminal organizations arrange for United States citizens to transport them to Tucson, Phoenix, or points farther north. (*Id*. at 16:11–22.) Agent Gamblin testified that these arrangements are coordinated by cellular telephone, and cellular service "is very spotty, if any." (*Id*. at 24:9–18.) He did not identify the specific area he was describing but testified generally that drivers unfamiliar with "that area" sometimes lose service, realize they are in the wrong place, and "end up driving in and out of areas multiple times or leaving and returning or leaving altogether and then coming back a short time later, once they have an accurate location." (*Id.* at 24:22–25:4.) In explaining why smugglers take the route they do, he said that "[o]nce they pick up on the Sonoita side, it's a lot quicker to get to a populated area by coming east over the pass." (*Id.* at 26:14–16.) He testified that load vehicles are "not directly picking up in our side of the pass" and that the majority of load vehicles that pick up "within close proximity" to the stations' "shared" area—"which is where we believe the Rogue picked up"—then travel over the pass "on our side." (*Id.* at 27:10–14.) He further testified that smuggling organizations use the canyons in the Sonoita Station area because the cameras can't see into the canyons, making those blind spots "hot spots for human smuggling." (*Id.* at 17:6–19:3.) Agent Gamblin did not testify that he had personally observed a pickup on the Sonoita side or identify the source of his knowledge that particular locations there were commonly used for pickups. (*See id.* at 26:12–21, 27:6–14.)

Agent Gamblin testified that a vehicle's entry into and departure from a canyon is not by itself significant to him; what the vehicle does while there is what raises or dispels

his suspicion. (*Id.* at 19:4–9.) A vehicle that remained at one of these locations for approximately an hour would not raise his suspicion because that was "pretty normal." (*Id.* at 18:22–19:13.) He testified that his own side of the pass, which has paved roads, a visitor center, restrooms, and other amenities, draws mostly local visitors making short stops, "just quick visiting because they've seen it before." (*Id.* at 20:6–14.) The west side of the pass, in Sonoita's area, has no amenities and little through traffic, and there, he testified, "from my experience, the people that visit the Sonoita side tend to make it worth it," spending longer periods to hike, picnic, or camp. (*Id.* at 20:15–22.)

On February 1, 2025, Agent Gamblin was on duty within about a mile of the Memorial, conducting routine checks and looking for vehicles not displaying normal baseline behavior. (*Id.* at 21:4–21.) Agent Gamblin testified that he was "advised about a suspicious vehicle in the Sonoita AOR" at approximately four o'clock that afternoon. (*Id.* at 22:3–5, 23:21–23.) The vehicle was a 2024 Nissan Rogue bearing a California license plate, which he later learned was a rental. (*Id.* at 22:6–12, 23:21–23.) At the evidentiary hearing, he was not asked who had advised him, and he did not say. Agent Gamblin explained: "We had received information from the Sonoita Station that they were observing that the rental vehicle had entered and exited several canyons in a pretty quick manner that wasn't consistent with normal day-to-day visitor traffic." (*Id.* at 23:9–12.)

On further questioning, Agent Gamblin testified that load vehicles had previously been apprehended after picking up in the same area but acknowledged that "[t]here are normal everyday travelers that enter those canyons, so just the fact that the vehicle was going into the canyon and coming out wasn't the main factor but more so that—how quickly they're entering and exiting those canyons is what roused suspicion for us." (*Id.* at 27:16–28:4.) The Sonoita agents who did observe the vehicle were not called to testify, and the record does not identify who received or relayed their observations to Agent Gamblin or how those observations were transmitted.

After receiving the information, Agent Gamblin positioned himself along Defendant's expected route at the corner where Montezuma Canyon Road turns north

toward State Route 92. (*Id*. at 25:21–26:11.) Defendant's vehicle exited the Memorial at approximately 4:50 p.m., and Agent Gamblin stopped it. (*Id*. at 39:7–11.) The vehicle matched the description and license plate he had received. (*Id*. at 42:9–23.)

Agent Gamblin testified that the vehicle's rental status was significant because rental vehicles offer anonymity: the registration returns to the rental company, making a driver who flees difficult to identify, and drivers who did not themselves rent the vehicle have less concern about its seizure. (*Id*. at 22:15–23:1.) He testified that the reported driving pattern would have been suspicious to him whether or not the vehicle was a rental, and that the rental status added to that suspicion. (*Id*. at 25:11–20.) He had no specific training regarding smugglers' use of rental vehicles beyond his own experience, had never discussed the subject with rental agency employees, and testified that many of the smuggling arrests in which he has participated involved privately registered vehicles, including a suspect's own or a borrowed vehicle. (*Id*. at 31:16–19, 31:24–32:10.) He agreed that he could think of other reasons a visitor to the Memorial might drive a rental car, (*id*. at 33:19–22), that people visit the Memorial from throughout the United States and from other countries, that no public transportation serves it, and that Tucson International Airport is likely the nearest airport. (*Id*. at 34:22–35:22.)

Agent Gamblin testified that the time of day was significant because smugglers prefer to operate near Border Patrol shift changes and Sonoita agents assigned to the remote area are often just arriving, or have not yet arrived, at around four o'clock in the afternoon. (*Id*. at 24:1–8.) He acknowledged that 4:10 p.m. is two hours after his own station's normal shift change. (*Id*. at 38:22–25.) The Memorial closes at sunset, although Agent Gamblin did not know what time the sun set on February 1, 2025. (*Id*. at 39:1–6.)

As to the route, Agent Gamblin testified that load vehicles picking up west of the pass commonly travel east over Montezuma Pass because the driving conditions and higher speed limits make it the quicker route to a populated area. (*Id*. at 26:12–21.) He acknowledged that an ordinary driver could take the same route for the same reason without carrying anyone unlawfully present. (*Id*. at 26:22–25.) The nearest gas stations and the

places to buy food lie east of the pass toward Sierra Vista, (*id*. at 37:7–21), and Bisbee, Tombstone, and Kartchner Caverns lie in that direction as well, (*id*. at 38:9–21). Agent Gamblin also testified that smugglers most commonly transport their passengers to Tucson or Phoenix and agreed that traveling west through Parker Canyon Lake and Sonoita would likely provide a more direct route to those cities. (*Id*. at 37:22–38:8.)

On cross-examination, Agent Gamblin acknowledged that he had not been told when or where the Sonoita agents first observed the vehicle. (*Id*. at 32:11–17.) He did not know the number of locations involved, recalling only "several canyons or a couple canyons, more than one, but the exact number, no." (*Id*. at 32:18–22.) Nor was he told how long the vehicle remained at any location; the report was "just kind of over quick, entry and exit, no specific time." (*Id*. at 32:23–33:1.) He did not ask for any of those details before stopping the vehicle. (*Id*. at 35:23–36:6.) When asked whether any factor other than the relayed information, the vehicle's rental status, and the route it had taken played into his decision to stop the vehicle, he answered, "No." (*Id*. at 36:10–15.)

Finally, Agent Gamblin did not observe Defendant's vehicle pick anyone up, and no such observation was relayed to him. (*Id*. at 39:14–25.) He observed no traffic violation, and none was reported. (*Id*. at 40:1–5.) He also did not attempt to observe the driver or occupants before initiating the stop, explaining that he avoids looking conspicuously at passing vehicles. (*Id*. at 41:15–24.)

## IV. DISCUSSION

Warrantless seizures "are *per se* unreasonable under the Fourth Amendment." *United States v. Cervantes*, 703 F.3d 1135, 1138 (9th Cir. 2012). The Government bears the burden of establishing that the stop of a vehicle falls within an exception to the warrant requirement. *Id.* at 1141. On roving patrol near the border, agents may stop a vehicle only if they are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975); *see United States v. Raygoza-Garcia*, 902 F.3d 994, 999 (9th Cir. 2018).

In determining whether an investigatory stop was supported by reasonable suspicion, a court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks and citation omitted). This approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) (internal quotation marks and citation omitted).

For a stop made near the border, the circumstances a court may consider include "characteristics of the area, proximity to the border, usual patterns of traffic and time of day, previous alien or drug smuggling in the area, behavior of the driver, appearance or behavior of passengers, and the model and appearance of the vehicle." *Valdes-Vega*, 738 F.3d at 1079 (citing *Brignoni-Ponce*, 422 U.S. at 884–85). Not every circumstance need be present, or highly probative, in a given case. *Id*. A court may not "engage in a 'divide-and-conquer analysis'" by examining each circumstance in isolation and setting aside those susceptible of innocent explanation, *Arvizu*, 534 U.S. at 274, because conduct that appears unremarkable standing alone may, in combination, furnish a particularized and objective basis for suspicion, *id*. at 277–78.

Reasonable suspicion must rest on objective facts, and any inferences drawn from those facts must "flow from objective facts and be capable of rational explanation." *Nicacio v. U.S. I.N.S.*, 797 F.2d 700, 705 (9th Cir. 1985), *overruled in part on other grounds by Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999). The resulting suspicion must be particularized: the facts must "raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez*, 449 U.S. 411, 418 (1981). Suspicion may not rest on "broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped," *United States v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002) (internal

quotation marks and citation omitted), or on "generalizations that, if accepted, would cast suspicion on large segments of the law-abiding population," *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006); *see Orhorhaghe v. INS*, 38 F.3d 488, 497 (9th Cir. 1994) (holding that the articulated facts "must provide a rational basis for separating out the illegal aliens from American citizens and legal aliens" (internal quotation marks and citation omitted)).

The Government argued at the close of the evidentiary hearing that reasonable suspicion arose from four circumstances: the vehicle's behavior, its location, the conduct of its occupants, and its rental status. (Doc. 64 at 69:11–14.) Its central contention was that the vehicle had entered "known pickup locations, not only one but several," moving in and out of them within a single afternoon in an area known for smuggling, and that the rental status added to the suspicion those movements created. (*Id*. at 69:21–24, 71:24–72:2.) The Government further emphasized that the agents who observed the vehicle worked in the area daily and knew it in a way a periodic observer would not. (*Id*. at 70:6–9.) At the same time, the Government acknowledged that most people in the area are there lawfully. (*Id*. at 71:2–6.)

Agent Gamblin identified a narrower set of grounds. Although he testified on direct examination that the character of the canyons and the time of day contributed to his suspicion, when asked on cross-examination what played into his decision to stop the vehicle, he identified only three: the information relayed from the Sonoita Station, the vehicle's rental status, and its route of travel. (*Id*. at 36:10–15.) He did not identify the time of day or the canyons' status as known pickup locations, despite having described both earlier as relevant to his suspicion. Because reasonable suspicion is assessed objectively, the Court considers all factors supported by the record and advanced by the Government, whether or not Agent Gamblin expressly identified each as a basis for the stop. The Court considers those factors collectively.

A. <u>The Report That Defendant's Vehicle Moved Quickly In and Out of Canyons</u>

This is the only circumstance in the record that describes conduct particular to

Defendant. Agent Gamblin testified that he received information from the Sonoita Station that the vehicle "had entered and exited several canyons in a pretty quick manner that wasn't consistent with normal day-to-day visitor traffic." (Doc. 64 at 23:9–12.) Conduct of that kind, if established, could contribute to reasonable suspicion. The question is whether the Government established it.

Agent Gamblin did not observe the vehicle in the canyons, and he could not supply the facts underlying the report because he was never given them. He was not told when or where the Sonoita agents first observed the vehicle. (*Id*. at 32:11–17.) He was not told which canyons or how many canyons were involved, recalling only that it was "several canyons or a couple canyons, more than one, but the exact number, no." (*Id*. at 32:18–22.) He was not told how long the vehicle remained anywhere: the report was "just kind of over quick, entry and exit, no specific time." (*Id*. at 32:23–33:1.) He did not ask for those details before stopping the vehicle. (*Id*. at 35:23–36:6.)

Agent Gamblin's testimony therefore established how the Sonoita agents characterized the vehicle's movements—that they were "quick" and "inconsistent with normal day-to-day visitor traffic"—without establishing the underlying observations necessary to evaluate that characterization. Reasonable suspicion must rest on objective facts, and the inferences drawn from them must be capable of rational explanation. *Nicacio*, 797 F.2d at 705. Without knowing how many canyons the vehicle entered, when it entered them, or how long it remained, the Court cannot determine whether the reported movements objectively distinguished Defendant from ordinary visitors.

Agent Gamblin's own testimony demonstrates why those details matter. He acknowledged that ordinary travelers enter the canyons and that entering and exiting them "wasn't the main factor" in finding reasonable suspicion. (*Id*. at 27:25–28:2.) A vehicle that remained at one of these canyons for approximately an hour does not raise Agent Gamblin's suspicion because that is "pretty normal." (*Id*. at 19:10–13.) Thus, whether the vehicle's movements resembled those of a load driver rather than an ordinary visitor depended on the timing and pattern of travel—precisely the details absent from the record.

The Government's argument that Defendant entered "multiple locations known for human smuggling," (*id.* at 71:24–72:1), rests on the same absent facts. Agent Gamblin testified that load vehicles had previously been apprehended after picking up "in this same area this Rogue was seen entering and exiting." (*Id.* at 27:23–25.) But the record does not identify which canyons Defendant entered or establish that those particular canyons were known pickup locations. The testimony therefore connects Defendant to the general vicinity, but not to any particular pickup location or hot spot. Agent Gamblin's testimony about prior smuggling activity also concerned an area west of the pass that his own patrols did not reach, and the record does not disclose the source of that knowledge.

The facts underlying the report were not placed before the Court by any other means. Where officers function as a team, the collective knowledge doctrine permits a court to consider the knowledge of all officers involved in an investigation, even though the officer who acted was unaware of the underlying facts. *See United States v. Ramirez*, 473 F.3d 1026, 1032–33 (9th Cir. 2007). Likewise, an officer may act on information received from another agency if the agency supplying the information possessed reasonable suspicion based on articulable facts. *See United States v. Hensley*, 469 U.S. 221, 232 (1985). But the collective knowledge doctrine does not lessen the Government's burden of establishing the factual basis for reasonable suspicion. *See Cervantes*, 703 F.3d at 1141. In *Whiteley v. Warden*, the Supreme Court held that an arrest made in reliance on a radio bulletin was invalid because the complaint underlying the bulletin failed to establish probable cause. The court explained that "an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." 401 U.S. 560, 568 (1971).

The Ninth Circuit applied that principle to investigatory stops in *United States v. Thomas*, holding that information received from another law enforcement agency "must itself be based on reasonable suspicion," and that an officer "cannot simply defer to the other agency's suspicion without establishing the articulable facts on which that suspicion is based." 211 F.3d 1186, 1189 (9th Cir. 2000). The information in *Thomas*—that officers

"might want to pay particular attention to a certain house"—was "devoid of specifics" and "too vague and generalized to play any part in the reasonable suspicion calculus." *Id*. at 1190.

Here, the Sonoita Station agents were not called as witnesses, and no report or other record of their observations was offered. The only evidence of what they observed was Agent Gamblin's testimony that he was told the vehicle moved in and out of several canyons "in a pretty quick manner." The record does not establish who made the observations, when or where they were made, how long Defendant remained at any location, which canyons Defendant entered, or how many canyons were involved. It is not clear that Agent Gamblin received the information directly. He testified that, "We had received information from the Sonoita Station that they were observing . . . the rental vehicle . . . enter[ing] and exit[ing] several canyons." (Doc. 64 at 23:9-12.) Agent Gamblin's experience could explain why particular driving behavior, once established, might indicate smuggling rather than ordinary recreation, but it could not supply those missing facts.

That distinction is especially important here because Agent Gamblin's explanation of why rapid canyon travel may indicate smuggling depended on conditions on the Sonoita side: that surveillance towers there cannot see into the canyons, that coordinators in Mexico monitor those camera feeds, that loads are taken on in those canyons rather than on his own side of the pass, and that visitors to the Sonoita side, which has no amenities and little through traffic, tend to stay longer rather than pass through. (*Id*. at 17:10–18:3, 20:15–22, 27:10–14.) Yet Agent Gamblin's patrols did not ordinarily extend west of Montezuma Pass; when asked how far west he typically traveled on roving patrol, he answered, "The mountain pass itself." (*Id*. at 29:24–30:11.) His station also lacked access to Sonoita's surveillance assets, and he testified that he was "generally not privy" to activity in Sonoita's area unless the two stations worked jointly. (*Id*. at 14:10–12, 31:9–15.) The reasonable suspicion determination may account for the collective knowledge of the officers involved and the inferences reached by experienced, trained officers. *See United States v. Burkett*,

612 F.3d 1103, 1107 (9th Cir. 2010). But where the question is not general expertise but the specific facts underlying a particular stop, the Court may not simply defer to another agency's assessment without the articulable facts supporting it. *See Whiteley*, 401 U.S. at 568; *Thomas*, 211 F.3d at 1189. Agent Gamblin's general knowledge of smuggling activity and visitor behavior on the Sonoita side therefore cannot substitute for the missing facts underlying the Sonoita Station's assessment of Defendant's particular conduct.

The Government bore the burden of establishing the articulable facts on which the suspicion rested. *Thomas*, 211 F.3d at 1189. It did not do so. The report from the Sonoita Station therefore carries limited weight in the reasonable suspicion analysis.

B. <u>The Character of the Area</u>

The Coronado National Memorial lies near the international boundary in a region with a history of smuggling, and load vehicles have previously been apprehended in the Memorial. (Doc. 64 at 15:25–16:1, 27:21–25.) Those facts are relevant. *See Valdes-Vega*, 738 F.3d at 1079. On this record, however, they carry limited weight.

An area's use by smugglers is of limited weight in the reasonable suspicion analysis where the great majority of those using it are doing so lawfully. *Sigmond-Ballesteros*, 285 F.3d at 1124. That is the case here. Agent Gamblin agreed that ordinary everyday travelers enter the canyons at issue. (*Id.* at 27:25–28:1.) He testified that visitors come to the Memorial to hike and picnic, and that people visit from throughout the United States and from other countries. (*Id.* at 20:15–22, 34:22–35:7.) The Memorial drew an average of 135,565 visitors per year between 2015 and 2024. (*Id.* at 48:11–21.) The Government acknowledged in closing that most people in the area are there lawfully, and that this is not "a national park filled with people going there to commit crimes." (*Id.* at 71:2–6.) Thus, although the area's proximity to the border and history of smuggling contribute to the reasonable suspicion analysis, those characteristics provide little "rational basis for separating out" those engaged in wrongdoing from the large number of lawful visitors to the Memorial. *Orhorhaghe*, 38 F.3d at 497; *see Manzo-Jurado*, 457 F.3d at 935 (reasonable suspicion may not rest on generalizations that would cast suspicion on large segments of

the law-abiding population).

C. The Rental Vehicle and Its Out-of-State Plates

The same difficulty attends the vehicle's rental status, which the Government identified as the factor that "specifically adds" to its suspicion. (*Id.* at 69:21–22.) Agent Gamblin testified that rental vehicles are favored by smuggling organizations because the registration returns to the rental company, making a fleeing driver difficult to identify, and because a driver who did not rent the vehicle has less concern about its seizure. (Doc. 64 at 22:15–23:1.) But the Ninth Circuit has observed that smugglers use vehicles of every description, including rental cars, and that rental status carries little weight standing alone. *See Sigmond-Ballesteros*, 285 F.3d at 1125.

The record supplies little more. Agent Gamblin had no specific training regarding the use of rental vehicles in smuggling beyond his own experience and had never discussed the subject with anyone at a rental agency. (Doc. 64 at 31:16–19, 31:24–32:2.) Many of the smuggling arrests in which he has participated involved privately registered vehicles, including a suspect's own or a borrowed vehicle. (*Id.* at 32:3–10.) He agreed that he could think of other reasons a visitor to the Memorial might drive a rental car. (*Id.* at 33:19–22.) Those reasons are evident on this record. The Memorial draws visitors from across the United States and from abroad, no public transportation serves it, and the nearest airport is in Tucson. (*Id.* at 34:22–35:22.) The visitor log at Montezuma Pass likewise recorded visitors from many states and from several other countries. (*Id.* at 61:9–62:15.) A traveler who flies into Tucson may therefore have an obvious reason to use a rental vehicle bearing out-of-state plates. Treating those characteristics as meaningfully suspicious would cast suspicion on a large and readily identifiable class of lawful visitors. *See Manzo-Jurado*, 457 F.3d at 935; *Diaz-Juarez*, 299 F.3d at 1141.

D. The Time of Day

The Government's reliance on the hour of the stop rests on a premise the record does not establish. Agent Gamblin testified that smugglers prefer to operate near Border Patrol shift changes. (Doc. 64 at 24:4-8.) However, he acknowledged on cross-examination

that 4:10 p.m. is two hours past his own station's normal shift change. (*Id.* at 38:22–25.) No evidence established the Sonoita Station's shift schedule, and the only shift-change time in the record is one the stop did not coincide with.

The hour is also consistent with lawful use. The Memorial closes at sunset and does not permit overnight camping. (*Id.* at 39:1–6, 58:1–3.) Agent Gamblin did not know what time the sun set on February 1, 2025. (*Id.* at 39:4–6.) A vehicle leaving the Memorial at 4:50 p.m. on a February afternoon is therefore also consistent with lawful visitor traffic.

E. <u>The Route of Travel</u>

Agent Gamblin relied on the route of travel, testifying generally that load vehicles picking up west of the pass commonly cross east over Montezuma Pass because the driving conditions and higher speed limits make it the quicker route to a populated area. (Doc. 64 at 26:12–21.) He acknowledged, however, that an ordinary visitor could take the route for the same reason without carrying anyone unlawfully present. (*Id.* at 26:22–25.) The nearest gas stations and places to buy food lie east of the pass toward Sierra Vista, and Bisbee, Tombstone, and Kartchner Caverns lie in that direction as well. (*Id.* at 37:7–21, 38:9–21.)

The route evidence cuts against the Government in one respect. Agent Gamblin testified that smugglers most commonly transport their passengers to Tucson or Phoenix and agreed that a vehicle traveling west through Parker Canyon Lake and Sonoita would likely have a more direct route to those cities. (*Id.* at 37:22–38:8.) Defendant's vehicle traveled in the opposite direction—toward the nearby services and attractions and away from Tucson and Phoenix, which Agent Gamblin identified as the most common destinations for smuggling loads.

F. <u>The Totality of the Circumstances</u>

The Court considers these circumstances collectively, not in isolation, and does not discount a circumstance merely because it is susceptible of an innocent explanation. *See Arvizu*, 534 U.S. at 274. The question is whether, taken together, the facts established by the Government provide a particularized and objective basis for suspecting Defendant of alien smuggling. They do not.

The only circumstance describing conduct particular to Defendant was the report that his vehicle moved quickly in and out of several canyons on the Sonoita side. But the Government did not establish the underlying timing, number, or pattern of those movements, limiting the weight of that report. The remaining circumstances—a rental vehicle bearing out-of-state plates, traveling in a national memorial near the border in the late afternoon and departing east toward the nearest services—are shared by a large class of lawful visitors. Taken together, those circumstances are not sufficiently particularized to support reasonable suspicion. They amount to generalized characteristics rather than an objective basis for suspecting *this* Defendant of criminal activity. *See Manzo-Jurado*, 457 F.3d at 935; *Orhorhaghe*, 38 F.3d at 497.

The R&R relies principally on *Valdes-Vega*, but that case does not compel a different result. There, the defendant was traveling on Interstate 15, a highway the agents identified as commonly used by smugglers coming from Mexico, near the northernmost Border Patrol checkpoint on the interstate. 738 F.3d at 1079. The agents also personally observed the conduct that distinguished the defendant from surrounding traffic: his truck was traveling at excessive speed, repeatedly changing lanes without signaling, weaving through traffic and cutting off other vehicles, and his driving changed as he approached the checkpoint in a manner the agents viewed as potentially evasive. *Id.* at 1079–80. The Ninth Circuit described the driving as "perhaps one of the most important factors" supporting reasonable suspicion. *Id.* at 1079–80.

Here, by contrast, Defendant was traveling through the Coronado National Memorial on a road used by both lawful visitors and smugglers, and Agent Gamblin observed no comparable conduct distinguishing Defendant's vehicle from ordinary traffic. He saw no traffic violation or evasive maneuvering and did not attempt to observe the driver or occupants before initiating the stop. The only evidence of Defendant's "suspicious" driving behavior came from observations made outside Agent Gamblin's presence and relayed without the underlying details necessary to determine whether that behavior distinguished Defendant from ordinary visitors.

## V. CONCLUSION

The Government's evidence establishes, at most, grounds for continued observation of Defendant's vehicle. It does not establish the particularized and objective basis required to justify an investigatory stop under the Fourth Amendment. Because the Government has not shown the stop was supported by reasonable suspicion, the evidence obtained as a result must be suppressed. *Thomas*, 211 F.3d at 1192.

Accordingly,

**IT IS ORDERED** that Defendant's Objection (Doc. 71) is **sustained**.

**IT IS FURTHER ORDERED** that the Report and Recommendation (Doc. 70) is **rejected**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress (Doc. 54) is **granted**.

Dated this 19th day of August, 2026.

Jennifer G. Zipps
Chief United States District Judge